Affirmed and Memorandum Opinion filed May 28, 2009








Affirmed and Memorandum Opinion filed May 28, 2009.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-07-00945-CR

____________

 

BAHRAM MAHBOUB JAHANIAN, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 183rd
District Court

Harris County, Texas

Trial Court Cause No. 1062640

 



 

M E M O R A N D U M   O P I N I O N








A jury found appellant Bahram Mahboub Jahanian guilty of
engaging in organized criminal activity with family members and others to
commit and conspire to commit the offense of theft of property over $200,000. 
At the punishment hearing, Bahram pleaded Atrue@ to two
enhancement paragraphs and the trial court sentenced him to confinement in the
Texas Department of Criminal Justice, Institutional Division, for life.  On
appeal, Bahram contends that the evidence is legally and factually insufficient
to prove that the total value of the property stolen was over $200,000; the
trial court erred in failing to provide the jury with an instruction defining Avalue@ and the error
caused egregious harm; and, applying the doctrine of in pari materia, he
was wrongly prosecuted under Texas Penal Code section 71.02 when he should have
been prosecuted under Penal Code section 32.47.  We affirm.

Factual and Procedural Background

Bahram Jahanian, referred to during the trial as AB.J.,@ does not dispute
the evidence that he participated in organized criminal activity.  The evidence
showed that from January 2004 through February 2006, B.J. and other members of
the Jahanian family, including Cindy Jahanian, B.J.=s wife, and their
son and daughter, Nicholas Jahanian and Krystal Jahanian, participated in a
theft scheme to unlawfully obtain merchandise from stores throughout Texas and
to sell the merchandise for profit though Nicholas Jahanian=s eBay account
named ABwatchers.@[1]  Others also
participated in the scheme, including two accomplices who testified during the
trial, Valerie Baker and Elizabeth Espirit.  The stores targeted in the scheme
included Target, Wal-Mart, Home Depot, and Lowe=s. 
Representatives of these stores were named in the indictment against B.J. 

B.J. was confined in a Texas prison during the time the
theft scheme operated.  Despite his confinement, from prison he instructed the
others as to how to carry out the scheme during prison visits with Nicholas or
by mail sent to Cindy at her residence, which she shared with Krystal Jahanian,
located at 19615 Spanish Needle in Harris County.  B.J.=s advice included
telling them to stay away from Target stores, to go out of town more, and to
use more than two drivers.  He also did not want Nicholas involved in going to
the stores.








The scheme operated as follows.  Cindy, Krystal, and an
accomplice, usually Elizabeth Espirit but sometimes others, would drive to one
of the stores somewhere in Texas, and Cindy and Krystal would enter the store
with labels showing UPC codes for low-priced merchandise that they or someone
else in the theft ring had purchased or stolen for the purpose of getting the
bar codes.[2] 
Once inside the store, Cindy and Krystal located usually at least two high-end
items such as MP3 players, faucets, cameras, phones, DVD recorders, or
printers.[3] 
While one acted as lookout, the other placed the bar-code labels for the
lower-priced merchandise over the bar code shown on the items so that the
desired merchandise could be purchased for a substantially lower price.  The
UPC codes the family used would ring up at the register as either a Lexmark ink
cartridge for $27.99 or a Brita water filter for $6.99, although the prices
might vary slightly at different stores. 

Once the bar codes were switched, Cindy or Krystal placed a
cell-phone call to the accomplice, who separately entered the store.  Cindy or
Krystal gave the accomplice a description of the desired merchandise and its
location.  Cindy and Krystal then left the store, and the accomplice, who was
also permitted to purchase a low-priced item for personal use at the ring=s expense, would
locate the merchandise and attempt to check out with it.  When possible, the
accomplice would take the merchandise to a check-out counter occupied by a
young, seemingly inexperienced clerk.  When the merchandise rang up at the
lower price shown by the switched bar code, the accomplice paid for it and the
personal item, left the store, and returned to the car.  The three would then
either go to another store or quit for the day.  Cindy and Krystal would then
store the stolen merchandise either at their home or a storage unit they
maintained.








To dispose of the merchandise, Nicholas Jahanian sold the
items on eBay using his eBay account, known as ABwatchers,@ and sent the
merchandise to whomever had purchased it.[4] 
Nicholas then distributed the profits among himself and the other members of
the ring, including Cindy and Krystal.  

Doug Osterberg, an investigator in the Harris County
District Attorney=s Office Special Crimes Division,
testified extensively about his involvement in the investigation of the theft
ring and its operation.  He testified that Nicholas was selling a large number
of items including faucets, cameras, cordless phones, print cartridges, MP3
players, gift cards, cameras, printer docks, and DVD recorders and players
through his Bwatchers account.  Based on State=s Exhibit 2A, a
list obtained from eBay of the items sold through Nicholas=s eBay account, Osterberg
testified that there were over 2,000 items sold from the early part of 2004
until the end of October 2005, and that Nicholas made $258,970 for the sale of
the items listed in State=s Exhibit 2A.  He also testified that,
during a short period when eBay suspended his account, Nicholas continued to
sell the same types of items through another source for a total value of about
$13,000.  Osterberg also testified that Nicholas continued to sell items on
eBay past October 2005.  Osterberg conceded that the State was not alleging the
theft of several items on the exhibit, such as three cars,[5]
a Yao Ming bobblehead doll, and some event tickets, but he testified that, even
subtracting those types of items, the value of the stolen items listed was
still well in excess of $200,000.








After obtaining the eBay records, Osterberg testified that
he began surveillance on the Jahanian family.  To assist him in the
surveillance, he contacted loss-prevention personnel at Target, Wal-Mart, Lowe=s, and Home Depot,
the four stores whose representatives were named in the indictment against
B.J.  The surveillance included two teams and took place over two days in
January 2006.  Osterberg=s team followed Nicholas Jahanian from his
residence, and the other team was dispatched to Cindy and Krystal Jahanian=s residence on
Spanish Needle to observe their actions.  Osterberg testified that on the first
day he observed Nicholas Jahanian and his then-girlfriend, Valerie Baker, at a
post office mailing ten cordless phones that appeared to be the same type of
phones pictured on Nicholas=s website.  After meeting with the other team
after the first day, Osterberg confirmed that Cindy, Krystal, and another
person were carrying out the theft scheme in Harris County, Brazos County, and
Washington County.  He also testified that Dee Williams, an investigator with
Target, compiled and turned over to him a number of videos and receipts of
transactions involving Cindy and Krystal at Target stores in Galveston, San
Antonio, Austin, and various stores throughout Harris County.  The State then
published to the jury surveillance video of Cindy and Krystal Jahanian and
Elizabeth Espirit engaging in the UPC-code-switching scheme at a Target on
Jones Road in Harris County on January 26, 2006, as Osterberg identified the
participants and explained their activities.








Osterberg testified that he decided to contact prison
authorities where B.J. resided to request that they send him copies of B.J.=s incoming and
outgoing mail.  He obtained copies of several hundred letters to and from B.J.
and his family members.  Some of the letters were routed through another inmate
to avoid interception.  Other letters were found later during a police search
of the Jahanian house on Spanish Needle.  One letter from B.J. to Cindy
discussed the potential of eBay; B.J. also sent a letter to Nicholas reflecting
that he was enclosing an article on the advantages of being an AeBay entrepreneur.@  Another letter
from B.J. included an article about a man who stole Legos worth thousands of
dollars from Target stores by switching bar codes on them and selling them on
eBay.  Osterberg testified that, based on his investigation, the letters,
although they may purport to discuss an eBay-related career, actually reflected
conversations about stealing, and he explained various shorthand references
used to indicate B.J.=s direction of the scheme=s operation.[6] 
The State subsequently filed charges against B.J., Cindy, Krystal, and Nicholas
Jahanian, the accomplice Elizabeth Espirit, and Valerie Baker, Nicholas=s former
girlfriend.  Police also executed arrest warrants and search warrants of
various locations.

In the guilt-innocence phase of the trial, B.J., who
represented himself, cross-examined investigator Osterberg.  Osterberg admitted
that the surveillance team observed Jahanian family members committing thefts
only during the surveillance of January 26, 2006, in Harris County, Washington
County, and Brazos County.  Osterberg explained that at the Jones Road Target,
the ring obtained six Lexmark printer cartridges that rang up as Brita water
filters.  Osterberg would not agree with B.J. that the store=s loss was the
value of the six $27.99 cartridges minus the $6.99 apiece paid for them;
Osterberg instead maintained that Target lost about $168 even though, as B.J.
posited, Target received about $42 for the cartridges.  B.J. then questioned
Osterberg about the ring=s attempted theft of two cordless phones
from a Wal-Mart in Brenham that same day.  Osterberg admitted that, because a
cashier discovered and peeled off the fake UPC codes, Elizabeth Espirit left
the store without purchasing anything.  Next, Osterberg testified that the ring
switched bar codes to obtain six water filters worth about $27B$28 apiece  at a
Lowe=s in Brenham; two
Delta faucets priced at about $220 apiece at a Home Depot in Brenham; and  two
more Delta faucets worth about the same amount at a Lowe=s in Bryan. 








Osterberg would not agree that these were the only thefts 
his investigation revealed; he testified that he linked B.J. and his family to
over $200,000 in theft from Wal-Mart, Target, Lowe=s, and Home Depot
based on State=s Exhibit 2A, talking to witnesses in the case, from
surveillance, and documents.  Osterberg admitted, however, that he had no Afirsthand
knowledge@ that the items were stolen.  He also conceded that he
never tried to recover one of the listed items from the purchasers to determine
through a lot number whether the item came from one of the stores.  In response
to additional questioning, Osterberg testified that for purposes of the
investigation, individuals from the district attorney=s office, Home
Depot, and Target bought items from Nicholas Jahanian=s website that
were the same type as those the theft ring was observed stealing.  

On redirect examination, Osterberg testified that he spoke
to the representatives of Target, Wal-Mart, Home Depot, and Lowe=s about trying to
trace an item purchased on eBay back to one of their stores, but he was
informed that it was not possible because those stores did not have the
technology to track their inventory that way.  Osterberg also testified that
Brady Bailey, a representative of Target, told him that after the Jahanians
were arrested, their statistics on thefts of the types of items they stole in
the region showed a noticeable decrease.








The State=s next witness was Valerie Baker, Nicholas
Jahanian=s former
girlfriend.  She testified that she met Nicholas while she was in optometry
school in 2004.  They became romantically involved, and he eventually moved in
with her and her roommate.  At that time, Nicholas told her he had just started
an eBay business.  Although Nicholas told her he was selling items for others
and also buying items from wholesalers to sell on eBay, she usually saw about
ten items individually packaged in Wal-Mart or Target bags; she saw no evidence
that Nicholas was getting the items he sold from wholesalers.  She testified
that Nicholas would pick up the items from Cindy and Krystal at their house or
a storage unit, and then he would Aship them out on
eBay.@  The types of
items she remembered seeing were electric shavers, cameras, paint ball guns,
and faucets.  Nicholas would give Cindy and Krystal money to go out and
purchase more items.  Valerie further testified that Nicholas would pick up
about ten items three to four days a week and mail them to the people who
purchased them from him on eBay.  He went to the post office to mail usually
five to six items about five days a week.  One time, when she accompanied him
to the post office, she saw him remove a sticker from an electric razor, and
she thought it was suspicious.  She also thought it was suspicious that
Nicholas did not receive items in bulk as she would expect from a wholesaler,
but rather Cindy and Krystal would bring Nicholas individual items in Target or
Wal-Mart bags, and Nicholas would give Cindy and Krystal each one-third of the
money he made. 

At first, Valerie testified, Nicholas told her that his
father had a wholesale business in Germany, but he later confessed that B.J.
was incarcerated Afor taking items from Wal-Mart.@  Eventually,
Nicholas also told her about his family=s
bar-code-switching scheme.  Nicholas told her that they mainly stole from
Wal-Mart and Target, but she thought she also remembered faucets coming from
Home Depot.  She confirmed that Cindy and Krystal delivered the stolen items to
Nicholas, who put them up for sale on eBay and then shipped them to the
purchasers.  She testified that he rationalized his behavior by saying that he
was not stealing, he was Ajust an eBayer,@ and in any event,
large stores like Target and Wal-Mart already Awrite off@ many items as stolen
or damaged, so the companies were not losing money.  Nicholas also told her he
learned about the scheme from his father, B.J.








Because of her feelings for Nicholas, Valerie testified
that she did not immediately leave him, and she helped him by packaging the
stolen items at the post office.  Consequently, Valerie admitted at trial that
she was a party to the same thefts the Jahanians were charged with committing. 
She further testified that, although Nicholas had no other job, he was able to
support himself, her, Cindy and Krystal, and he paid Elizabeth Espirit for her
participation in the scheme.  Nicholas also would  deposit money from the theft
enterprise into B.J.=s commissary fund so that B.J. could buy
things in prison.  Valerie further testified that she would go with Nicholas to
visit B.J. in prison, where they would discuss stealing in front of her. 
Nicholas would report to B.J. and B.J. would advise Nicholas on ways to steal
more effectively.  Valerie also testified that Nicholas was suspended from eBay
for about thirty days for engaging in Ashield bidding,@ or using another
account to bid on his own merchandise to increase the prices, and he continued
to sell items by taking them to an eBay store that would list the items for
him.  During that time, they took many items worth thousands of dollars to the
eBay store to sell.  On cross-examination by B.J., Valerie insisted that she
believed that B.J. administered an organized crime ring from his jail cell.

The State next called Larry Boucher, a lieutenant
investigator for the Harris County District Attorney=s Office in the
Major Fraud Division and investigator Osterberg=s supervisor.  He
testified concerning his participation in the surveillance on January 26, 2006,
of the theft ring=s operation.  As the jury viewed a
surveillance tape from a Harris County Target, Boucher narrated what he saw
from the store=s video room, which was equipped with cameras both
inside and outside the Target.  He described Cindy and Krystal Jahanian coming
into the store, with Elizabeth Espirit following behind them.  They then
separated inside the store.  Along with some other items, Cindy and Krystal
picked up two Kodak camera and printer bundles, priced at $249.99 each.  But,
as they went through the store, they appeared to begin to suspect that they
were being observed, and so they abandoned their cart and left the store. 
Cindy, Krystal, and Elizabeth Espirit all left in the same car and went to the
Jones Road Target, which Osterberg had described to the jury previously.  








Boucher next described following the women to a Brenham
Wal-Mart, where they followed the theft ring=s usual pattern. 
Boucher narrated the video surveillance for the jury.  At the Wal-Mart, Cindy
and Krystal picked up two boxes of Panasonic digital cordless phones, walked
down the store=s aisles, and then left the cart as they made a
cell-phone call.  Elizabeth Espirit then came up and pushed the cart toward a
self-checkout register.  Elizabeth scanned some children=s socks and then
the phones.  A supervisor noticed that she was having trouble scanning the
phones and came over to the register.  When the supervisor tried to scan the
phones again, she noticed they were scanning for considerably less than they
should, and peeled off the UPC code stuck on the box.  When the phones rang up
at the correct price, Elizabeth made an excuse not to buy the items and left
the store.  The State then introduced evidence from this encounter, including
photographs of the phones, the fake UPC codes taken from the phones, and the
receipts that rang up.  Boucher testified that Nicholas Jahanian had the same
model phone for sale on his eBay account, and that UPC-code stickers of the
same type were found during the search of Cindy and Krystal=s home on Spanish
Needle.  Boucher further testified that the actual price for the phones was
$313.86, but they rang up as two cartridges for $27.97 apiece.  Thus, Boucher
testified, the ring was going to walk out with about $250 in merchandise.

Next, Boucher testified that the women then went to a
nearby Lowe=s where they followed the same pattern.  As the jury
observed video surveillance of this location, Boucher explained that Cindy and
Krystal went to an aisle containing Brita water filters; they then left that
aisle and Elizabeth came and picked up four of the water filters and went to
the counter.  Boucher testified that the water filters were $32 each, but they
did not scan for that amount.  All of the women left the store.  Other
personnel observing the transaction then attempted to recreate it, and they
determined that the four water filters rang up as $6.96 apiece, rather than $32
apiece.  From there, Boucher testified, the women went to a Home Depot nearby,
where, following the same pattern, Elizabeth paid cash for two faucets, priced
at $208, that rang up for $26.87 each.  Thus, the ring made a little over
$300.  Again, the jury was shown surveillance video and physical evidence of
the scheme.  Lastly, the women went to a Lowe=s in Bryan where
they were followed by the surveillance team.  Boucher testified that Cindy and
Krystal went down the aisle where the faucets were located and stayed there for
a few minutes as they handled some of the faucets.  They then left and
Elizabeth came down the same aisle, picked up two faucets, and purchased them
for $6.87 each, when the actual price would have totaled about $308.  








Boucher then described the search of the Jahanians= Spanish Needle
home following their arrests.  At the house, the investigators found, among
other things, a printer, fraudulent UPC codes reflecting the same numbers as
those used on the products seen in the surveillance videos, and paper for
printing the UPC codes.  A Braun shaver that was the same type Nicholas sold on
his eBay website was also found in Krystal=s bedroom. 
Exhibits consisting of physical evidence and photographs of the home were
admitted into evidence.  Boucher testified that, in Krystal Jahanian=s carCthe car used in
the scheme on January 26, 2006Cthey found her purse, which contained a
UPC code with the same numbers on it as those peeled off by the clerk at the
Wal-Mart in Brenham and the ones found in the house.  In the passenger-side
front door panel they found clippings from the paper on which the UPC codes
were printed, and a number of receipts from various Targets, Lowe=s, and Wal-Marts,
located in Austin, San Antonio, Tomball, Spring, and Cedar Park.  The receipts
reflected purchases of water filters for $6.96 apiece.  The car=s trunk contained
bags from Target.  Cindy=s car also contained Target bags.

Boucher further testified that Cindy gave consent to search
a self-storage facility where the investigators found many preprinted shipping
boxes with the eBay logo and mailing labels showing Nicholas Jahanian=s address. 
Investigators also found bags from Wal-Mart, Academy, Target, and Lowe=s piled up in the
storage room, and amongst them were fraudulent UPC codes showing the same
numbers as the UPC codes the theft ring had used.  

On cross-examination, Boucher did not disagree that six
Lexmark cartridges worth about $168 were stolen from the Jones Road Target, and
nothing was taken from the Wal-Mart where the fake UPC codes on two cordless
phones were discovered and removed.  Boucher also agreed that the Brenham Lowe=s lost about $150
after subtracting what Elizabeth paid for the six water filters she obtained,
the Brenham Home Depot lost $416 on the two Delta faucets, and the Bryan Lowe=s lost about $250
after subtracting what Elizabeth paid for them.  When asked whether these were
the only thefts he had seen in the course of his investigation, Boucher
maintained that all of the items on the eBay list were Ataken in the same
manner.@  But Boucher
admitted that he did not personally see any other thefts.








Patrick Smith, another investigator with the Major Fraud
Division of the Harris County District Attorney=s Office,
testified that he assisted in the investigation of the Jahanians by using his
established eBay account to purchase items from Nicholas Jahanian=s eBay account. 
He explained that an established account would be less likely to arouse
suspicion than a new account.  Smith testified that he bought a Delta kitchen
faucet from Nicholas for $157.50 through the Bwatchers account.  The faucet was
shipped to him from the Spanish Needle address.  Smith also testified that he
often checked the Bwatchers account, and he noticed a pattern in which the
account would offer two or three faucets, phones, or other items at one time,
and when the auctions of those items ended, they were immediately replaced by
similar items.  On cross-examination, Smith admitted he could not say with
certainty the faucet he bought was stolen.








The State=s next witness was Thomas Brady Bailey, an
organized crime investigator for Target Corporation, and one of the named
complainants.  Bailey testified that, as a representative of Target, he had a
greater right to items stolen from Target than the person who stole them.  He
testified that he bought a Panasonic phone on eBay from Bwatchers that was the
same brand and model that Target sold at that time, and several of the same
model were for sale on the Bwatchers website.  Bailey also testified that he
was present at the search of the Spanish Needle house and the storage
facility.  He confirmed that the numbers on the UPC codes found in those
locations matched the UPC codes on products Target carried at that time.  He
also confirmed that Target sold all of the items listed on the indictment
against B.J.  Bailey also identified numerous items listed on State=s Exhibit 2A as
items that Target sold.  According to Bailey, it was not possible to trace a
particular product back to a particular Target store.  Bailey testified that,
based on his investigation, he believed that some of the items on State=s Exhibit 2A were
stolen from Target based on the Aoverwhelming@ evidence from the
videos, the surveillance, the testimony of the co-defendants, and his common
sense.  He also testified that after the Jahanians were arrested the losses in
those types of products dropped Avery, very
substantially.@  On cross-examination, Bailey testified that he
determined that Target had lost $133,000 from the thefts.  Although he could
not say specifically whether an item on State=s Exhibit 2A came
from a particular Target store, he could say that Athose are like
items that we sold at Target.@  Bailey also confirmed that Target did
not carry some of the items on the list, such as faucets or paint ball
equipment. 

The State then called Elizabeth Espirit.  She testified
that she met the Jahanians through her then-fiancé, who was in the Harris
County Jail at the same time as B.J. Elizabeth=s fiancé got
Krystal Jahanian=s phone number from B.J. and told
Elizabeth that Krystal would be calling to meet with her about a part-time
job.  She eventually met with Krystal and Cindy, and they Awent for a ride@ ending up in
Alvin.  The Jahanians did not tell Elizabeth they would be stealing.  The women
arrived at a store, either a Wal-Mart or a Target, and Cindy and Krystal told
her to wait in the car while they went inside.  A little while later, they came
out and told her to purchase a specific item and where it would be located. 
Elizabeth testified that at first she did not realize what she was doing, but
soon figured it out.  Over the months that followed, the theft ring=s favorite stores
were Wal-Mart and Target, but they also went to Home Depot, Lowe=s, Academy and
Sears.  Elizabeth testified that one of the women told her to pick young
cashiers because they did not Acare as much@ as an older
cashier would.  She further testified that she always paid for the items with
cash Cindy or Krystal gave her.  She explained that the ring stole from stores
in many locations in Texas. 








Elizabeth also testified that the theft ring would not only
use the UPC codes from Lexmark ink cartridges or Brita water filters to obtain
the higher-priced merchandise, they also used the receipts for the
higher-priced merchandise, which rang up as ink cartridges or water filters, to
return the ink cartridges and water filters they had originally purchased for
cash.  As an example, she explained that the ring would steal a $30 Lexmark ink
cartridge by putting a $6 UPC code from a Brita water filter on it and buying
it for $6.  The Jahanians would take the Lexmark ink cartridge and  make copies
of its UPC code.  Then, for example, the ring would steal two Panasonic phones
from Wal-Mart or Target using the Lexmark UPC codes.  The phones would ring up
as Lexmark ink cartridges, generating a receipt reflecting the purchase of two
Lexmark ink cartridges at their actual price.  The ring would then return the
ink cartridges, for which they paid $6 apiece, using the receipt showing the
purchase of Lexmark ink cartridges for between $26B$30 apiece, for
cash.  Sometimes, Elizabeth testified, if they could not get cash, they would
get a gift card for returned items.

Elizabeth further testified that she stole many of the
types of items on the indictment, although she could not recall stealing some
of them.  She estimated that over the thirteen-month period that she was with
Cindy and Krystal they had stolen over $200,000 worth of items from about 400
stores.

Stoney Burke, an eBay fraud investigator, testified
concerning how items are bought and sold on eBay generally.  He also testified
that the Bwatchers account belonged to Nicholas Jahanian and listed the Spanish
Needle address.  Through the Bwatchers account, Burke testified that over 2,100
items were listed for sale, and as of the time the account information was
subpoenaed in October 2005, the price of the items sold totaled $258,907.36. 
Burke further testified that the Bwatchers account continued to sell items
after that information was compiled, and the account remained active until
February 28, 2006, when eBay shut it down.  








Tim Scott, who worked in loss prevention for Lowe=s and was one of
the named complainants, testified that he participated in the surveillance of
the Jahanians.  He also testified that as a representative of Lowe=s he had a greater
right possess any stolen items than the person who stole them.  He then
identified the items on State=s Exhibit 2A that Lowe=s sold at the
relevant time.  Scott testified that, at that time, it was not possible to
track a specific item like a faucet purchased from eBay to a particular store. 
On cross-examination, Scott testified he had personally seen the Jahanians
participate in six specific thefts, but he did not know the total value of the
items stolen in the six thefts.  He also testified that the same brands of
items stolen from his store were on Nicholas=s eBay list, but
he admitted that he had no personal knowledge that anything Nicholas sold on
eBay was stolen from his store. 

Mary Jo Meador, a financial-crimes investigator for
Wal-Mart Stores, Incorporated, and another named complainant, testified next. 
She testified that, as a representative of Wal-Mart, she had a greater right to
possess items that were stolen from Wal-Mart than the persons who stole them. 
She identified the types of items Wal-Mart sold during the relevant time that
were listed on State=s Exhibit 2A.  Meador also testified that
Wal-Mart did not have the technology to trace an item bought on eBay back to an
individual store.  On cross-examination, Meador did not know how much of the
over $200,000 allegedly stolen was attributable to Wal-Mart.  She also admitted
she had no personal knowledge of the thefts committed by the individuals named
in the indictment, and could not tell if specific items on the list came from
Wal-Mart.  








The State next called Dee Williams, a loss-prevention
manager for Target.  Williams was also involved in the surveillance and
investigation of the Jahanians.  After that, she testified, she conducted
further research and found evidence of additional thefts, including videos of
the theft ring operating in various Target stores.  Williams narrated for the
jury a video of the theft ring unsuccessfully attempting to obtain two Kodak
camera and printer bundle packs priced at $249.99 from a Pasadena Target.  The
ring had attempted to purchase the items using UPC codes from Lexmark printer cartridges,
which Target also sold, but the fake codes were discovered and no items were
purchased.  Williams also testified concerning the ring=s return scheme
through which the theft ring could steal, for example, a $200 shaver for $6. 
Williams=s testimony of how
the scheme worked was similar to Elizabeth Espirit=s testimony, but
was more detailed.  Williams also found video and other evidence of the theft
ring carrying out the return scheme at the Pasadena Target store, which the
State showed to the jury as Williams explained the theft ring=s actions.

On cross-examination, Williams testified that she identified
seven or eight thefts in January of 2006 resulting in a loss of about $2,500. 
She admitted that she could not say with certainty that any of the items
Nicholas sold on eBay came from her stores, but she also testified that she
knew that the items the Jahanian family were stealing Aover and over
again@ from Target
stores were the same types of items they were selling on eBay.

Marshal Poe, a loss-prevention manager for Home Depot,
testified as another of the named complainants.  He testified that, as a
representative of Home Depot, he had a greater right to possess stolen property
than the person that stole it.  Poe identified the categories of items on State=s Exhibit 2A that
Home Depot sold.  Poe testified that, as part of the investigation of the
Jahanians, his team was asked to purchase faucets from the Bwatchers eBay
account, and the items purchased were consistent with items carried by Home
Depot at that time.  Poe also testified that Home Depot did not have the
ability to track an item purchased on eBay to a particular store.  On
cross-examination, Poe conceded that he could not say with certainty that any of
the items on State=s Exhibit 2A came from his stores.

The State=s last witness was Darrell Smith, who
testified that he had known B.J. and his family since May 2000.  He opined that
B.J. Apositively@ was in charge of
the family.  On cross-examination, Smith further opined that he considered B.J.
Aa sociopath@ and Adomineering.@  The State then
rested.  

B.J. called one witness for the defense, attorney Richard
Kuniansky, who testified concerning his prior representation of Krystal
Jahanian.  He testified that the State had offered Krystal a plea bargain of
five years.  Krystal did not accept the plea bargain, however, and after a jury
trial with different counsel, she was sentenced to twenty-five years in
prison.  The defense then rested.








Analysis

On appeal, B.J. raises four issues.  In his first and
second issues, B.J. contends that the evidence is legally and factually
insufficient to prove that the total value of the property appropriated was
over $200,000.  In his third issue B.J. contends that the trial court=s failure to
provide a definition of Avalue@ under Texas Penal
Code section 31.08 resulted in egregious harm to him.  In his fourth issue,
B.J. contends that, under the doctrine of in pari materia, he was
wrongly prosecuted under Texas Penal Code section 71.02 when Penal Code section
32.47 was the more specific statute.  We will address each in turn.

I.        Legal
and Factual Sufficiency of the Evidence

In his first and second issues, B.J. contends that the
evidence is both legally and factually insufficient to prove that the total
value of the property appropriated by the Jahanian family, which theft provided
the basis of the organized-crime allegation against him, was over $200,000. 
Because B.J. discusses the issues together, we will do likewise.

A.      Standards
of Review 

In reviewing the legal sufficiency of the evidence, we look
at the evidence in the light most favorable to the verdict and determine
whether any rational trier of fact could have found the essential elements of
the crime beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S.
307, 319 (1979); Vasquez v. State, 67 S.W.3d 229, 236 (Tex. Crim. App.
2002).  Although we consider all evidence presented at trial, we may not
re-weigh the evidence and substitute our judgment for that of the jury.  King
v. State, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000).  The jury is the
exclusive judge of the credibility of witnesses and of the weight to be given
their testimony, and it is the exclusive province of the jury to reconcile
conflicts in the evidence.  Mosley v. State, 983 S.W.2d 249, 254 (Tex.
Crim. App. 1998).








In reviewing the factual sufficiency of the evidence, we
view all of the evidence in a neutral light. See Cain v. State, 958
S.W.2d 404, 408 (Tex. Crim. App. 1997); Clewis v. State, 922 S.W.2d 126,
134 (Tex. Crim. App. 1996).  We may set the verdict aside if (1) the evidence
is so weak that the verdict is clearly wrong and manifestly unjust; or (2) the
verdict is against the great weight and preponderance of the evidence.  Watson
v. State, 204 S.W.3d 404, 414B15 (Tex. Crim.
App. 2006) (citing Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App.
2000)).  While we may disagree with the jury=s conclusions, we
must exercise appropriate deference to avoid substituting our judgment for that
of the jury, particularly in matters of credibility.  Drichas v. State,
175 S.W.3d 795, 799 (Tex. Crim. App. 2005); see also Watson, 204 S.W.3d
at 414 (stating that an appellate court should not reverse a verdict it
disagrees with unless it represents a manifest injustice, though supported by
legally sufficient evidence).  Thus, while we are permitted to substitute our
judgment for that of the jury when considering credibility and weight
determinations, we may do so only to a very limited degree.  Marshall v.
State, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006).

Circumstantial evidence is as probative as direct evidence
in establishing an actor=s guilt.  Guevara v. State, 152
S.W.3d 45, 49 (Tex. Crim. App. 2004).  Indeed, circumstantial evidence alone is
sufficient to establish guilt.  Id.  Furthermore, the standard of review
on appeal is the same for both direct- and circumstantial-evidence cases.  Id.









A person engages in organized criminal activity Aif, with the
intent to establish, maintain, or participate in a combination or in the
profits of a combination, . . . he commits or conspires to commit@ one of several
enumerated offenses, including theft.  Tex. Penal Code Ann. ' 71.02(a)(1)
(Vernon 2007).  Theft is committed when a person Aunlawfully
appropriates property with intent to deprive the owner of property.@  Tex. Penal Code
Ann. ' 31.03(a) (Vernon
2003).  AAppropriate@ means Ato acquire or
otherwise exercise control over property other than real property.@  See Tex.
Penal Code Ann. ' 31.01(4)(B) (Vernon 2003).  Appropriation
of property is unlawful if it is Awithout the owner=s effective
consent@ or Athe property is
stolen and the actor appropriates the property knowing it was stolen by
another.@  See Tex.
Penal Code Ann. ' 31.03(b)(1), (2). 

B.      Application
of Law to Facts








B.J. appears to concede that he and his co-defendants did
engage in organized crime as alleged, but contends that Aany suggestion
that the value of the items wrongfully appropriated is over two hundred
thousand dollars is based on nothing more than guesswork.@  First, B.J.
points to State=s Exhibit 2A and contends that the State=s case rested on
the assumption, without supporting evidence, that an item sold by Bwatchers
that was the same make or model as one sold in a store must have been obtained
through theft.  B.J. points out that investigator Osterberg did not
individually identify which items on State=s Exhibit 2A were
stolen, and he conceded that some items, such as the cars and event tickets,
were not suspected of having been stolen.  Further, no other witness undertook
to itemize or otherwise distinguish the items on the list that were allegedly
stolen from those that were legitimately obtained.  B.J also points out that
Osterberg was unable to trace any item on the list to any of the complainants= stores, and the
only thefts he actually witnessed totaled a little more than $1,200.  Second,
B.J. asserts that a review of State=s Exhibit 2A
reveals many items that were not listed in the indictment or the jury charge,
and questions what the total value of the allegedly stolen items is after these
items are deducted.  Third, B.J. contends that, under Penal Code subsection
31.08(d),[7]
the consideration given for the stolen items, namely the $6.99 or $27.99 that
Elizabeth Espirit or another accomplice  paid for those items, should have been
deducted from the total value.  Based on the evidence, B.J. argues, it is
impossible to ascertain with any accuracy which items were actually stolen and
what their value may have been.

But direct evidence alone is not required to sustain a
conviction.  It is well established that a fact finder can determine the
identity and ownership of stolen property from circumstantial evidence.  See
Jordan v. State, 707 S.W.2d 641, 644B45 (Tex. Crim.
App. 1986) (AProof of ownership may be made by circumstantial
evidence, just as any other issue in a criminal case.@); Jones v.
State, 458 S.W.2d 89, 91B92 (Tex. Crim. App. 1970) (A[A]rticles in an
accused=s possession may
be identified by circumstantial evidence as well as by direct testimony.  If it
appears it or they correspond with articles that were stolen, the question may
go to the jury.@); Villani v. State, 116 S.W.3d
297, 306 (Tex. App.CHouston [14th Dist.] 2003, pet. ref=d) (AProof of ownership
may be made by circumstantial evidence.@); Robinson v.
State, No. 01-85-00970-CR, 1986 WL 12889, at *2 (Tex. App.CHouston [1st
Dist.] Nov. 13, 1986, pet. ref=d) (not designated for publication) (AIt is well settled
that the identity and ownership of stolen property may be established by
circumstantial evidence.@).








Here, the jury heard the cross-examinations of the
witnesses, including the various witnesses= admissions that
they could not specifically connect any of the items on State=s Exhibit 2A to
their stores.  But the State=s inability to demonstrate a connection by
serial number or other identifier does not by itself render the evidence
legally or factually insufficient.[8] 
See Guevara, 152 S.W.3d at 49 (AThe lack of direct
evidence is not dispositive of the issue of a defendant=s guilt.@).  Under the
circumstances, the jury reasonably could have inferred that the property shown
on State=s Exhibit 2A that
corresponded to the allegations in the indictment and evidence was the same
property the theft ring stole from the stores.  See Benson v. State, 240
S.W.3d 478, 481B82 (Tex. App.CEastland 2007,
pet. ref=d) (AWe hold that the
evidence is sufficient to support Benson=s conviction. . .
. In this case, Benson was shown having several items similar to those taken
without there being any variance between the description and the items she had
in her possession. . . . As noted by Benson, a conviction may no longer fall
because the property possessed is not shown to be the identical property taken.@); Rogers v.
State, 929 S.W.2d 103, 108 (Tex. App.CBeaumont 1996, no
pet.) (rejecting claim that evidence was insufficient to support burglary
conviction and noting that it was for the fact finder to weigh whatever
descriptive evidence and circumstances of guilt are presented regarding
identification of the missing property to determine whether the property possessed
by the defendant is the same property taken from the complainant=s residence,
including the particular setting in which the accused possessed the property
and the specific type and quantity of the property possessed); see also
Nickerson v. State, 810 S.W.2d 398, 399B401 (Tex. Crim.
App. 1991) (holding that evidence was legally sufficient to establish that
equipment recovered from car in which defendant was passenger was same
equipment taken from electronics store even though the evidence did not show
that it was the identical property taken).








Here, the State presented considerable circumstantial
evidence, accomplice testimony, and other evidence to establish that most, if
not all, of the property shown on State=s Exhibit 2A was
stolen from the stores whose representatives are named in the indictment.  The
testimony from the store representatives established that each of the stores
sold in varying degrees merchandise of the types alleged in the indictment that
State=s Exhibit 2A
reflected was sold by Nicholas Jahanian on his eBay account.  The accomplice
testimony and other evidence, discussed above, showed that (1) the theft ring
of which B.J. was a part stole large quantities of the types of merchandise
alleged in the indictment from the stores during the relevant time, and (2)
Nicholas sold the merchandise stolen by the ring from those stores on eBay for
the benefit of the theft ring=s members. 

Additionally, State=s Exhibit 2A
showed not only the vast quantity of merchandise of the types alleged in the
indictmentCover 2,000 itemsCbut also the price
at which he actually sold each of the items.  The State concedes that the
aggregate total sales price amount of $258,9770.36 shown on State=s Exhibit 2A
included some items that were either not alleged in the indictment, mentioned
in the charge, or within the types of merchandise shown sold by the stores, and
therefore were not to be included in calculating the value of the merchandise
stolen from the stores.  But the jury was aware from investigator Osterberg=s testimony that
some of the items should not be considered in its value determination.  And, as
B.J. notes, items such as cars and event tickets were not alleged in the
indictment or the jury charge, and so would not have been considered by the
jury.  B.J. seems to suggest that excluding the items that were not allegedly
stolen would result in an amount below $200,000, but he does not expressly
allege that to be so and does not demonstrate that it is so.  Taking B.J.=s suggestion to
its conclusion, this court undertook its own review of State=s Exhibit 2A and
determined that the sales prices of items not alleged in the indictment as
stolen account for less than $25,000 of the total of $258,970.36.  Thus, even
subtracting the items B.J. contends should not have been included in the jury=s calculation, the
total amount is still well in excess of $200,000.








Just as this court did, the jury was capable of reviewing
State=s Exhibit 2A and
determining which items were included in the indictment and which should be
disregarded.  Osterberg testified that he linked B.J. and his family to over
$200,000 in theft from Wal-Mart, Target, Lowe=s, and Home Depot
based on State=s Exhibit 2A, surveillance, documents, and talking to
witnesses in the case,
including people from Wal-Mart, Target, Lowe=s, and Home Depot.[9]
 The
jury could determine the aggregate value of the items it found were stolen from
the stores whose representatives were named in the indictment and conclude that
the value of the stolen items exceeded $200,000.  See Valdez v. State,
116 S.W.3d 94, 98B99 (Tex. App.CHouston [14th
Dist.] 2002, pet. ref=d) (rejecting claim that evidence of value
over $200,000.00 was legally and factually insufficient in theft prosecution in
which investigator calculated the value of stolen electronic components by
determining the lowest price for which the items could have been purchased near
the time of the theft and appellant offered contradictory testimony that the
value was much lower based on the amount for which he could sell certain of the
stolen items).  Further, in addition to considering the amounts identified on
State=s Exhibit 2A, the
jury heard evidence that Nicholas sold additional items totaling about $13,000
through an independent eBay store while his eBay account was suspended.  The
State also presented evidence that the theft ring continued selling items on
eBay after the date the eBay compiled the information on State=s Exhibit 2A. 

Lastly, although B.J. contends Ait is beyond
dispute@ that
consideration was given in each instance when an item was stolen, and appears
to complain that the jury should have deducted such amounts from the aggregate
value of the allegedly stolen items based on Penal Code subsection 31.08(d),
neither this subsection nor the evidence supports this assertion.  Subsection 31.08(d)
specifically provides: 

If the actor proves by a
preponderance of the evidence that he gave consideration for or had a legal
interest in the property or service stolen, the amount of the consideration or
the value of the interest so proven shall be deducted from the value of the
property or service ascertained under Subsection (a), (b), or (c) to determine
value for purposes of this chapter.








Tex.
Penal Code Ann. ' 31.08(d).  B.J. does not point out where
in the record he offered proof of any total dollar amount of consideration that
any member of the theft ring paid for the stolen merchandise, or any means,
formula, or reasonable basis by which such an amount could be calculated. 

Moreover, the evidence presented is contrary to B.J.=s representation. 
The record reflects that the theft ring purchased or stole lower-priced
merchandise, often items that would ring up as roughly either about $7 or $27,
to obtain or to forge bar-code labels to put on the higher-priced merchandise
they desired.  At the stores, they switched the UPC codes on the higher-priced
merchandise with the UPC codes for the lower-priced merchandise previously obtained,
so that they could purchase the higher-priced items for the price of the
lower-priced goods.  The higher-priced items generated receipts show the
purchase of the lower-priced merchandise, which the theft ring would then use
to return the lower-priced merchandise to obtain a cash refund or, in some
instances, a gift card.  As Elizabeth Espirit and Dee Williams testified, in
some instances the theft ring was actually able to make a profit on returned
items, such as when they would return a $27 Lexmark printer cartridge they
obtained for $6 (by using a fake UPC code from a Brita water filter), and get a
refund of the printer cartridge=s actual price of $27.  State=s Exhibit 2A also
reflects that a number of gift cards were sold on Nicholas Jahanian=s eBay account,
providing an additional source of profit to the ring.  Consequently, even
though members of the theft ring paid the price rung up for the lower-priced
merchandise at the time they obtained the higher-priced merchandise from the
stores, the jury could have determined that at least some, if not most, of the
higher-priced merchandise cost them little or nothing. 








Under the facts and circumstances of this case, the jury
could have rationally inferred that the theft ring=s members stole
from the four complainants the types of merchandise alleged in the indictment,
with a total value greater than $200,000.  And, viewed in a neutral light, the
evidence is not so weak that the jury=s verdict seems
clearly wrong and manifestly unjust, nor is the contrary evidence so strong
that the jury=s verdict is against the great weight and
preponderance of the evidence.  See Watson, 204 S.W.3d at 415B16; Jahanian v. State, No.
14-07-00700-CV, (Tex. App.CHouston [14th Dist.] May 28, 2009, no pet. h.) (mem. op., not
designated for publication) (holding evidence of ownership property legally and factually sufficient
to support conviction of Nicholas Jahanian for same UPC-code-switching scheme); Jahanian v. State, No. 14-07-00702-CV, (Tex. App.CHouston [14th Dist.] May 28, 2009, no
pet. h.) (mem. op., not designated for publication) (holding evidence of ownership and
value of property legally and factually sufficient to support
conviction of Krystal Jahanian for same UPC-code-switching scheme); Jahanian v. State, No. 14-07-00703-CV (Tex. App.CHouston [14th Dist.] May 28, 2009, no
pet. h.) (mem. op., not designated for publication) (holding evidence of
identity and value of property legally and factually sufficient to support
conviction of Cindy Jahanian for same UPC-code-switching scheme).  

We therefore overrule B.J.=s first and second
issues.

II.       Jury
Instruction on Value

In his third issue, B.J. contends that the trial court
failed to provide a definition of Avalue@ under Texas Penal
Code section 31.08 and that this failure caused him egregious harm.  Although
B.J. concedes he did not request the definition or object to its omission from
the charge, he argues that, Awith or without@ a request from
the parties, the trial judge should have included in the jury instructions a
definition of Avalue@ because value was Athe only contested
issue.@  

A.      Standards
of Review








The review of alleged jury-charge error is a two-step
process.  Abdnor v. State, 871 S.W.2d 726, 731 (Tex. Crim. App.
1994); Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App.
1984).  First, we examine the jury charge to see if the trial court erred.  Abdnor,
871 S.W.2d at 731B32.  Second, if we find that the
trial court erred, we must determine if the harm is sufficient to warrant
reversal.  Id.  When a timely objection is made, error in the jury
charge requires reversal if the error was Acalculated to
injure the rights of defendant,@ meaning that the error was not harmless. 
See Tex. Code Crim. Proc. Ann. art. 36.19 (Vernon 2006); see also
Abdnor, 871 S.W.2d at 731B32.  But because
B.J. did not timely object to the jury charge, any error will not require
reversal unless the error is so egregious that B.J. was not given a fair and
impartial trial.  See Almanza, 686 S.W.2d at 174.  If we do find
error in the jury charge, we must review the entire record to determine whether
B.J. suffered egregious harm.  Sanchez v. State, 209 S.W.3d 117, 121
(Tex. Crim. App. 2006).  An error in the jury charge is egregious if Ait affects the
very basis of the case, deprives the defendant of a valuable right, or vitally
affects a defensive theory.@  Id.  We must assess the degree of
harm caused by a charge error Ain light of the entire jury charge, the
state of the evidence, including the contested issues and weight of probative
evidence, the argument of counsel and any other relevant information revealed
by the record of the trial as a whole.@  Almanza,
686 S.W.2d at 171.

B.      The Trial
Court Did Not Err in Failing to Submit Jury Instruction on Value

The value of property in theft prosecutions is (1) the fair
market value of the property at the time and place of the offense, or (2) if the fair market value of the
property cannot be ascertained, the cost of replacing the property within a
reasonable time after the theft.  See Tex. Penal Code Ann. ' 31.08(a) (Vernon
2003).  And, as discussed above, section 31.08 also provides that if a
defendant proves by a preponderance of the evidence that he gave consideration
for or had a legal interest in the property or service stolen, Athe amount of the
consideration or the value of the interest so proven shall be deducted from the
value of the property or service ascertained . . . to determine value for
purposes of this chapter.@  Id. ' 31.08(d).








As an initial matter, the State argues that section 31.08
does not apply to a prosecution under chapter 71 for the offense of engaging in
organized criminal activity.  See Tex. Penal Code Ann. ' 71.02(a).  The
State argues that, by its express terms, subsection 31.08(a)=s definition of
value applies only to an offense under chapter 31 of the Penal Code.  See Tex.
Penal Code Ann. ' 31.08(a) (providing that Avalue@ under section
31.08 is Avalue under this chapter@).  Further, the
State notes that subsection 31.08(d) is likewise restricted to Apurposes of this
chapter@ and so is not
required in a court=s charge for an offense under Penal Code
chapter 71, particularly in the absence of a request for it or an objection to
its omission.  In support of its argument, the State cites Garrison v. State,
726 S.W.2d 134 (Tex. Crim. App. 1987); Gray v. State, 51 S.W.3d 856
(Tex. App.CTexarkana 2001), pet. dism=d, 85 S.W.3d 300
(Tex. Crim. App. 2002) (per curiam); and Winters v. State, No.
14-00-00400-CR, 2001 WL 1168205 (Tex. App.CHouston [14th
Dist.] Oct. 4, 2001, pet ref=d) (not designated for publication).  In
this circumstance, however, we disagree with the State=s argument and
find the State=s cases distinguishable.  








Here, B.J. was charged with and convicted of the offense of
organized criminal activity under chapter 71, with the underlying offense being
theft.  See Tex. Penal Code Ann. ' 71.02(a)(1) (AA person commits
an offense [of engaging in organized criminal activity] if, with the intent to
establish, maintain, or participate in a combination or in the profits of a
combination or as a member of a criminal street gang, he commits or conspires
to commit . . . theft.@).  Consistent with Penal Code section
31.03, the trial court=s charge instructed the jury on the
elements of theft.  And, consistent with Penal Code section 31.09, the jury
also was instructed as follows:  AWhen amounts are
obtained by theft pursuant to one scheme or continuing course of conduct, whether
from the same or several sources, the conduct may be considered as one offense,
and the amounts so taken aggregated to determine the grade and of the offense
and the value of property taken.@  In each of the
cases the State cites, the definition of a particular weapon was taken from a
chapter unrelated in any way to the charged offense.  See Garrison,
726 S.W.2d at 138B39 (stating that trial court should not
have included definition of Aknife@ for use in
chapter 46 offenses in prosecution for aggravated robbery and assuming error); Gray,
51 S.W.3d at 858B59 (holding that trial court erred in
including chapter 46 definition of Aknife@ in charge for
aggravated robbery under chapter 29); Winters, 2001 WL 1168205, at *2
(holding that chapter 46 definition of Aclub@ did not apply to
aggravated assault charge at issue because definition applied only to chapter
46 offenses).  In contrast, although the primary offense alleged here was
organized criminal activity under chapter 71, the underlying offense was theft
under chapter 31, and we cannot say that including definition of Avalue@ provided in
section 31.08 in such a case would necessarily be error.

But, having determined that a section 31.08 definition of
value may be appropriate in this situation, we must still determine whether, as
B.J. argues, the trial court erred in failing to sua sponte include it
in the jury charge.  Subsection 31.08(a) generally states that the value of
property for the purpose of an offense under chapter 31 is Athe fair market
value of the property . . . at the time and place of the offense,@ except for
situations when fair market value cannot be shown, and in that case replacement
value is applied.  Although Afair market value@ is not
statutorily defined, it has long been stated to mean the amount of money that
the property would sell for in cash, giving a reasonable time for selling it.  Keeton
v. State, 803 S.W.2d 304, 305 (Tex. Crim. App. 1991).  Fair market value
may be proved by evidence of retail price, sales price, testimony of an owner=s opinion of
value, or expert opinion of value, but no single method for proving fair market
value has been held to be conclusive.  Id.  As the Court of Criminal
Appeals has recognized, A[u]se of various methods to show fair
market value is certainly due to the necessity for flexibility because of the
various circumstances of theft that arise.@  Id. 








Here, the only dispute regarding value really related to
the identity of the property shown on State=s Exhibit 2A as
property stolen from the stores, as discussed above.  No evidence presented
suggested that the fair market value of the stolen items could not be proven or
that replacement value was an appropriate alternative, and there was no dispute
concerning whether the State=s evidence showing the value of the items
demonstrated their fair market value.  The State relied on its Exhibit 2A as
evidence of the value of the stolen items, and investigator Osterberg testified
that the value of the property appropriated from the stores was over $200,000
based on Nicholas Jahanian=s sales on eBay. 

Under these circumstances, the addition to the charge of a
definition of value as Afair market value@ would have been
unnecessary and would not have assisted the jury, because nothing in the record
suggests that the proof the State relied on to show value showed anything other
than fair market value as that term is both defined under the common law and is
commonly understood.  Therefore, the trial court could not have erred by
failing to sua sponte include section 31.08=s definition of Avalue@ in the charge.

Finally, B.J. also appears to complain that the trial court
erred in failing to include subsection 31.08(d)=s provision for
offset for consideration, because its omission left the jury Aignorant of the
law@ providing for an
offset for consideration the accused paid.  See Tex. Penal Code Ann. ' 31.08(d). 
However, as discussed above, the evidence does not support B.J.=s contention that
the jury should have considered evidence of consideration paid for the
allegedly stolen items when determining value.  For the same reason, B.J. was
not entitled to an instruction under subsection 31.08(d), and therefore the
trial court could not have erred in omitting it from the charge.  








When evidence from any source raises a defensive issue, and
the defendant properly requests a jury charge on that issue, the trial court
must submit the issue to the jury.  Muniz v. State, 851 S.W.2d 238, 254
(Tex. Crim. App. 1993).  But there is no duty imposed on a trial court to
instruct the jury on unrequested defensive issues, even though the issues are
raised by the evidence.  See Bennett v. State, 235 S.W.3d 241, 243 (Tex.
Crim. App. 2007); Posey v. State, 966 S.W.2d 57, 62B63 (Tex. Crim.
App. 1998).  At least one court has held that consideration in a theft case is
a defensive issue and the trial court does not err by omitting an instruction
based on section 31.08(d) when the defendant fails to properly request it.  See
Oglesby v. State, 01-08-00158-CR, 2009 WL 144989, at *4B5 (Tex. App.CHouston [1st
Dist.] 2009, no pet.) (mem. op., not designated for publication).  We agree
that an instruction under section 31.08 is in essence one pertaining to a
defensive issue, and therefore, in the absence of a request or an objection,
the trial court did not err in failing to sua sponte include such an
instruction in the charge.  See Bennett, 235 S.W.3d at 243, Posey,
966 S.W.2d 62B63; Oglesby, 2009 WL 144989, at *4B5.

Even if we assume the requested instruction is not
defensive in nature, we conclude that the trial court did not err in failing to
include it in the charge because B.J. was not entitled to such an instruction. 
For Penal Code subsection 31.08(d) to apply, B.J. must first Aprove[] by a
preponderance of the evidence that he gave consideration for or had a legal
interest in the property or service stolen.@  See Tex.
Penal Code Ann. ' 31.08(d).  But, as discussed above, B.J.
directs us to no evidence by which he proved that he gave actual consideration
to the stores for the stolen merchandise; therefore, he cannot demonstrate that
he was entitled to an instruction based on subsection 31.08(d).  See Bogia
v. State, No. 01-02-00950-CR, 2004 WL 253263, at *3B4 (Tex. App.CHouston [1st Dist]
2004, pet. ref=d) (mem. op., not designated for publication) (holding
trial court did not err in denying requested instruction under Penal Code
section 31.08(d) when appellant failed to prove by a preponderance of the
evidence any value conferred upon complainant). 

Because we have determined that the trial court did not err
by failing to instruct the jury on the definition of Avalue@ provided in Penal
Code section 31.08, we need not consider B.J.=s argument
concerning egregious harm.  We overrule his third issue.

 

 








III.      The
Doctrine of In Pari Materia

In his fourth issue, B.J. contends that, under the doctrine
of in pari materia, he was wrongly prosecuted under Texas Penal Code
section 71.02, because Penal Code section 32.47 was the more specific statute. 
However, to preserve a complaint for review, a party must present a timely
request, objection, or motion stating the specific grounds for the desired
ruling if such grounds are not apparent from the context of the request,
objection, or motion.  See Tex. R. App. 33.1(a)(1).  B.J. fails to point
out where in the record he presented his contention to the trial court, and our
review of the record reveals he never did.  Therefore, B.J. has failed to
preserve the issue for appeal.  See Agu v. State, No.
14-06-00816-CR, 2008 WL 660311, at *2 (Tex. App.CHouston [14th
Dist.] March 11, 2008, no pet.) (mem. op., not designated for publication)
(holding appellant=s failure to timely object to substance of
indictment under in pari materia doctrine waived complaint on appeal); Martin
v. State, No. 10-03-00071-CR, 2004 WL 2305154, at *1 (Tex. App.CWaco Oct. 13,
2004) (mem. op, not designated fro publication) (same).

We overrule B.J.=s fourth issue.

Conclusion

Having overruled B.J.=s issues, we
affirm the trial court=s judgment.

 

 

 

 

/s/      Jeffrey V. Brown

Justice

 

 

 

Panel consists of
Justices Frost, Brown, and Boyce.

Do Not Publish C Tex. R. App. P. 47.2(b).









[1]  Cindy, Krystal Jahanian, and Nicholas Jahanian were
tried together, while Bahram Jahanian, who represented himself, was tried
separately.  This court also considered the appeals of Cindy, Krystal, and
Nicholas Jahanian in Cause Nos. 14-07-00703-CR, 14-07-00702-CR, and
14-07-00700-CR, respectively.





[2]  There was also evidence indicating that UPC codes
were forged for this purpose.





[3]  The indictment against B.J., as amended, alleged the
following types of merchandise:  shavers, MP3 players, faucets, music stations,
speakers, printers, camcorders, thermostats, cameras, printer docks, print
servers, software, phones, DVD-VHS recorder, DVD recorders, paintball markers
with masks and tanks, toothbrushes, paint ball guns, tennis racquets, gift
cards, water filters, and print cartridges.  The owners of the property were
alleged to be Brady Bailey, Tim Scott, Marshall Poe, and Mary Jo Meador, as
representatives of Target, Lowe=s, Home Depot,
and Wal-Mart, respectively.





[4]  The address for the Bwatchers account was Cindy=s home on Spanish Needle.





[5]  Although Osterberg stated that the cars totaled Aapproximately $9,000,@ the total value of the cars was actually $10,349.00.





[6]  For example, Osterberg testified that, based on the
information he obtained through his investigation, references to Adrivers@
meant the people the Jahanians hired to go in the stores, Atrips@ were
references to stealing, and references toAD,@ AA,@ and ASA@ meant the places where they would go to steal, like
Dallas, Austin, and San Antonio, respectively.  His testimony was similar to
that of Valerie Baker, who testified that a Atrip@ meant carrying out their scheme in a store, AT@ meant Target,
and Apull-offs@
were when a cashier discovered the fake bar code and pulled it off.





[7]  Penal Code subsection 31.08(d) provides: 

 

If the actor proves by a preponderance of the evidence
that he gave consideration for or had a legal interest in the property or
service stolen, the amount of the consideration or the value of the interest so
proven shall be deducted from the value of the property or service ascertained
under Subsection (a), (b), or (c) to determine value for purposes of this
chapter.

 

Tex. Penal Code Ann. ' 31.08(d) (Vernon 2003).





[8]  The evidence showed that Nicholas Jahanian promptly
sold the property taken by the theft ring through his eBay account and shipped
it to the purchasers throughout the country and elsewhere.  Testimony from the
store representatives established that property taken from the stores was not
susceptible of identification by serial number or other unique identifier. 
Thus, as a practical matter, in an organized-criminal-activity case of this
type the State could rarely, if ever, prove that all the property a theft ring
stole and sold in a worldwide market such as eBay was the exact property taken
from the victims because of the manner in which the theft ring disposed of it.





[9]  While this testimony may have been based on hearsay
or subject to other evidentiary objections, B.J. did not object and this
testimony was admitted in evidence.  See Fernandez v. State,  805
S.W.2d 451, 456 (Tex. Crim. App. 1991) (holding the evidence legally sufficient
even though the conviction was based on hearsay offered after the complainant=s recantation); accord Jackson v. State, 110
S.W.3d 626, 631 (Tex.App.CHouston [14th Dist.] 2003, pet. ref=d) (holding that a conviction may rest on hearsay even
though the victim recants).