Frank Elam GARRISON, III, Appellant,

v.

The STATE of Texas, Appellee.

No. 192–85.

Court of Criminal Appeals of Texas, En Banc.

March 11, 1987.

Michael Byck, Lawrence B. Mitchell (on appeal only), Dallas, for appellant.

Henry Wade, Dist. Atty., and John D. Nation and Mike Hasse, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

W.C. DAVIS, Judge.

A jury convicted appellant of aggravated robbery and assessed punishment at forty-eight years' confinement. The Dallas Court of Appeals affirmed the conviction in an unpublished opinion. *Garrison v. State*, No. 05–83–01350–CR (delivered December 18, 1984). We granted appellant's petition for discretionary review in which he challenges the Court of Appeals' holding that probable cause existed for his warrantless arrest and that, therefore, his confession was properly admitted as the fruit of a lawful arrest. Appellant also contends that the court's charge to the jury at the guilt-innocence stage of trial is fundamentally defective because of an improper definition of "knife." We granted his petition to address both issues.

The facts surrounding appellant's arrest are necessary to a review of his contention that probable cause to arrest was not shown at trial. The complainant testified that she stopped at a store in Richardson on her way to work on May 10, 1983. It was about 12:55 p.m. when she got back into the van she was driving and continued on her way to work. Appellant, who had been hiding in the back of the van, ran toward the complainant. He carried a knife in his hand, had a stocking mask over his face, and ordered her to stop the van. After taping a stocking over her head and taping her wrists together, appellant pulled the complainant's pants down to her knees. The complainant convinced him that she was menstruating so he told her to roll over on her stomach and he unzipped his pants and rubbed his penis against her anus. Appellant then rummaged through the complainant's purse and took some money. He drove the van for a few minutes, removed the tape and mask from the complainant's wrist and face, and then left the van. The complainant then drove to her office immediately, arriving at 1:15 p.m.

Jo Ann Bensinger, a co-worker of the complainant's, testified that the complainant arrived at work on May 10, 1983, at about 1:15. She was very upset. Appellant's hearsay objection as to what the complainant said to Bensinger was sustained. Bensinger called the police and "told them that one of my coworkers had just arrived at the office and had had a problem on her way into work." Bensinger also told police that the complainant told her the attacker was a white adult male,

wearing a stocking cap, blue t-shirt, blue jeans and was of stocky build. Bensinger said the police came out and talked to the complainant and her that afternoon, although she did not say what time.

Officer John Paul Barnes testified that at about 1:15 p.m. on May 10, 1983, he was dispatched on a suspicious person call to the south alley of the 600 block of Cambridge Drive. The suspicious individual was described as wearing a stocking over his head, a blue shirt and blue jeans. This was the same description given by Bensinger when she called the police. At trial Barnes did not detail why this individual was a "suspicious person."

Five or ten minutes after receiving the call, Barnes was in the specified area and saw appellant, who fit the description given, except he was not wearing a stocking over his head. Appellant was jogging down the street, which, because he was not wearing jogging clothes and because it was raining, Barnes thought was "kind of funny." Barnes stopped his car and told appellant he wanted to talk to him for a minute. Appellant said "sure" and went over to the car. Barnes asked him where he was going and appellant replied, "Nowhere." Barnes asked him who he was and appellant gave him his Texas driver's license. Barnes told appellant to sit on the curb while he did some investigating. Appellant became very nervous, "almost jumping up and down." He told Barnes he had to go and reached to grab his driver's license from Barnes. Barnes again told him to sit on the curb and appellant said "okay." Barnes then gave the dispatcher the information on the driver's license and asked for a warrant check. He drove a block or so away to where his back-up unit was and turned around to find that appellant had left.

Barnes radioed the dispatcher that he had stopped the described person, who had then disappeared. Appellant's hearsay objection as to what the dispatcher then informed Barnes was sustained.

Barnes drove by appellant's house but did not find him. He then met with the complainant and talked to her "about an offense committed against her."

Detective K.D. Mackenzie, Jr., of the Richardson Police Department, testified that he was in his office at the police station on May 10, 1983, at about 1:00 p.m. when he heard a "possible rape call" on the police radio and heard that Officer Barnes "had a suspect that he believed to be the suspect involved in the rape case," who was appellant. Mackenzie started to drive to the location Barnes had named when he heard Barnes say that the suspect had run southwest from the location. Mackenzie knew appellant and headed toward his house. Mackenzie was driving in an alley behind appellant's house when he saw appellant jump out of some bushes and run. Mackenzie ordered appellant to stop but he ran and hid behind an air conditioner. Mackenzie found him and arrested him.

Appellant requested a *Jackson-Denno* [1] hearing before the trial, at which the voluntariness of the confession was the only issue. The arrest was not addressed either factually or legally. During trial the State sought to introduce appellant's confession into evidence.

MR. BYCK: [defense counsel] To which we will object for reasons heretofore stated, Your Honor, that this confession is a result of an illegal arrest and is involuntary.

THE COURT: I recall the grounds that you stated outside the presence of the jury. I understand your grounds now. Do you have further grounds?

MR. BYCK: No, Your Honor, no further grounds.

THE COURT: Objection is overruled. State's Exhibit 1 is admitted into evidence. [2]

---

**1.** 378 U.S. 368, 84 S.Ct. 1774, 2 L.Ed.2d 908 (1964).

**2.** Until this point, appellant had never mentioned the arrest in any context. His objection may have been somewhat misleading since he included "illegal arrest" as one of his objections "heretofore stated," which it certainly was not. However, the objection was clearly stated and from the record it appears that the court apparently understood it and overruled it. The State thus, never had the opportunity to prove proba-

■ Once appellant objected to the arrest as an illegal warrantless arrest, the burden shifted to the State to prove its legality. See *Russell v. State*, 717 S.W.2d 7 (Tex.Cr.App.1986). Because the court overruled appellant's objection the State never specifically proved the legality of the arrest under Chapter 14, V.A.C.C.P., including probable cause.

■ The test of probable cause for a warrantless arrest is

'Whether at that moment the facts and circumstances within the officer's knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [arrested person] had committed or was committing an offense.'

*Muniz v. State*, 672 S.W.2d 804 (Tex.Cr.App.1984) quoting *Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). Where several officers are involved the sum of the information known to the cooperating officers at the time of arrest is to be considered in determining probable cause. *Woodward v. State*, 668 S.W.2d 337 (Tex.Cr.App.1984) (opinion on rehearing).

There are several significant gaps in the record as to the collective information known by the police when they arrested appellant. The complainant did not say what she told Bensinger. Bensinger said she stated to police only that her coworker "had had a problem." There are no facts showing what the police knew or that the police even knew an offense had been committed by the described individual. Barnes testified that he received a "suspicious person call" for an individual matching the description which Bensinger told police.

Barnes properly stopped appellant pursuant to the suspicious person call. Barnes learned appellant's name and address but nothing further, and appellant left after Barnes drove down the block. We do not know what the dispatcher told Barnes after he radioed appellant's name and address. Mackenzie testified that he joined the pursuit for appellant after hearing about a "possible rape call" and hearing that Barnes had a suspect involved in the rape case. After pursuing the fleeing appellant, Mackenzie arrested him.

The record does not show what "reasonably trustworthy information" was known to police to show why they believed appellant had committed an offense. In fact, Mackenzie's reference to a rape call is the only indication as to what offense they believed appellant had committed and there is no testimony as to where this information came from or its basis, so that it could be considered "reasonably trustworthy information."

■ The record simply does not contain the base or foundation knowledge so as to warrant a prudent man in believing that appellant had committed an offense. Missing is what the complainant said to Bensinger, the specifics of what Bensinger told the dispatcher, and the subsequent information relayed by the dispatcher to Barnes. We know that Bensinger's characterization of the "problem" relates to the offense detailed by the complainant. However, the police did not, *as far as the record shows*, know anything about the offense at the time they arrested appellant, other than that the complainant "had had a problem" on her way to work with a man fitting appellant's description. Such information

---

ble cause for the warrantless arrest because the issue was never raised until this point and then appellant's objection was immediately overruled by the court. Unfortunately, in overruling the objection to the admission of the confession on the basis of the illegality of the arrest, the court did not give, nor did the State seek, an opportunity to elicit testimony about probable cause.

In connection with this, the State argues that appellant should be estopped from complaining about probable cause because he successfully objected during trial to hearsay evidence apparently pertinent to showing probable cause. The

State is wrong for several reasons, but, particularly because the hearsay objection was a good objection when made during the guilt-innocence stage. Probable cause had not been contested at this point. Once it was contested by a contention of an illegal arrest the hearsay would be admissible to prove such. But, until that point the hearsay was not admissible at guilt-innocence. *Murphy v. State*, 640 S.W.2d 297 (Tex.Cr.App.1982), cited by the State, is not applicable. It pertains to a defendant's requested jury charge concerning evidence that the defendant prevented from getting before the jury.

may have warranted the stop of appellant, but the record lacks any further information to demonstrate probable cause to believe appellant had committed an offense.

*Earley v. State,* 635 S.W.2d 528 (Tex.Cr. App.1982) wherein the warrantless arrest was illegal is somewhat analogous. The deputy arrested the defendant in response to a report made by a citizen over a C.B. radio, but the record of the case did not reveal the *content* of what the citizen told the deputy. See also *Law v. State,* 574 S.W.2d 82 (Tex.Cr.App.1978) and *Tarpley v. State,* 565 S.W.2d 525 (Tex.Cr.App.1978), both cited by the Court of Appeals, in which the record showed much more information. In *Law,* supra, the officers had spoken to the victim of the crime and knew the specific offense which had been committed. Within minutes after speaking to the victim, the police located the described vehicle and the defendants were arrested. In *Tarpley,* supra, the security officer informed the police that the credit card used by the defendants was stolen. In both cases the police knew exactly what acts had occurred to constitute an offense and knew descriptions of the defendants.

In the instant case the officers do not detail on the record why appellant was a "suspicious person." The record does not reflect that any of the officers knew what acts appellant had done to authorize an arrest. A description and information that appellant was one with whom another "had had a problem" does not constitute probable cause to believe appellant had committed an offense. See also *Muniz,* supra, and *Marrs v. State,* 647 S.W.2d 286 (Tex.Cr. App.1983) wherein the officers knew that a burglary had been committed at a particular house, knew the description of the suspects, and upon stopping the suspects in the area learned from inconsistent explanations and from the suspect's appearance further facts substantiating the witnesses' information. The officers knew details about the offense and the suspects from what witnesses told them. No such information is presented in the record of the

instant case. Cf. *Blackmon v. State,* 644 S.W.2d 738 (Tex.Cr.App.1983).

The record in the instant case simply does not reveal that the police knew the necessary information about the offense so as to show probable cause to believe appellant had committed an offense. Whether or not appellant's confession made after this illegal arrest should have been admitted must be decided by the Court of Appeals. The case will be remanded to the Court of Appeals to consider the admissibility of the confession and, if necessary, the harmfulness of its improper admission.

We next consider appellant's contention that the definition of "knife" included in the court's charge to the jury was incorrect and constitutes fundamental error.[3] Appellant contends that the improper definition relieved the State of the burden of proving an element of its case. We disagree.

The trial court included the following definitions in the abstract portion of the charge:

> By the term 'deadly weapon' is meant a firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury, or, anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.
> 'Knife' means any bladed hand instrument that is capable of inflicting serious bodily injury or death by cutting or stabbing a person with the instrument.

The indictment and the application paragraph of the charge state that robbery was committed by use of a deadly weapon, to-wit: a knife. The trial court included the definition of knife that is found in V.T.C.A., Penal Code, § 46.01(7). Sec. 46.-01 states: "In this chapter", and then lists definitions, including the one for "knife." Such language appears to limit the definitions to use with Chapter 46 offenses. Therefore, the trial court should not have included such definition in an aggravated robbery charge. It is difficult to character-

---

**3.** Appellant's only argument is one of fundamental error because he did not object to the charge on the ground now urged.

ize the definition as "error" because it is not that the definition does not fit the weapon used by appellant, but simply that the specific definition is set out for use with Chapter 46 offenses. In any event, assuming the mistake is "error" we must determine whether or not it deprived appellant of a fair trial. *Almanza v. State,* 686 S.W.2d 157 (Tex.Cr.App.1984). In accord with *Almanza,* supra, we review the evidence elicited at trial and the argument given.

The complainant testified that appellant approached her and exhibited at her side a pocket-knife with a two-inch blade. Detective Steve Upchurch testified that the complainant told him appellant placed the knife near her head or throat and ordered her to drive to a particular spot. Upchurch also said such knives as that described[4] could be used in such a manner and means as to inflict serious bodily injury.

Most of defense counsel's argument to the jury discussed the deadly weapon aspect of the case. Counsel argued that "a short two-inch blade" was not a deadly weapon as shown by the manner of its use in the instant case. Defense counsel argued that the knife was not used in a threatening manner but was merely "displayed" to the complainant. Defense counsel used the definition of deadly weapon as a frequent reference point and he repeatedly used the definitional language in arguing the manner of use was not shown to be that of a deadly weapon.

The State responded to defense counsel's argument and discussed appellant's exhibition of the knife, also emphasizing the use and intended use.

Both sides based their arguments almost entirely on the deadly weapon issue. Both sides referred to the definition of deadly weapon and repeated its language. No reference was made to the definition of "knife" and no issue was made that the weapon was not a knife. The only issue during argument was whether the knife, as used, was a deadly weapon as that was defined in the charge.

The definition of knife does not include or state that it is a deadly weapon. The application paragraph required the jury to find that appellant committed a robbery and that a knife was used and that knife was a deadly weapon. The inclusion of a definition for knife simply required the jury to find that the weapon used was a knife as defined in the charge *and also* to find that that knife was a deadly weapon as defined in the charge. Nothing in the charge relieves the jury of a duty to find the elements as set out in the application paragraph with reference to their definitions in the abstract portion of the charge. The judge did not instruct the jury that the knife was a deadly weapon as an matter of law. See *Benson v. State,* 661 S.W.2d 708 (Tex.Cr.App.1983) (opinion on second motion for rehearing). Thus, the inclusion of a definition of knife did not relieve the State of proving that such "knife", as described, was a "deadly weapon."

In light of the evidence showing that a knife was involved, in light of the arguments made by both sides directed to the deadly weapon issue, and in light of the charge requiring the jury to find that robbery was committed by use or exhibition of a "deadly weapon, to-wit: a knife," we do not believe appellant was denied a fair trial. The jury was directed by the charge, the evidence, and the argument that one of the elements that the State had to prove and the jury had to find in order to convict appellant was use or exhibition of a deadly weapon. The ground of error is overruled.

The judgment of the Court of Appeals is affirmed in part and reversed in part. The case is remanded to the Court of Appeals for consideration of whether admission of appellant's confession was proper and whether such admission, if improper, was harmful.

CLINTON, TEAGUE and WHITE, JJ., concur in the result.

ONION, P.J., and McCORMICK, J., dissent.

---

4. The knife used by appellant was never recovered.