In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
**NO. 09-24-00164-CR**

**DERWIN DEWAYNE BELL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 19th District Court**
**McLennan County, Texas**
**Trial Cause No. 2021-1275-C1**

**MEMORANDUM OPINION**

Derwin Dewayne Bell was indicted for two counts of the second-degree felony offense of aggravated assault with a deadly weapon. Tex. Penal Code Ann. § 22.02.[1] A jury found Bell guilty in Count I, and the trial court declared a mistrial in Count II. In two issues, Bell complains that the jury charge contained an improper

---

[1]This case was transferred from the Tenth Court of Appeals pursuant to a docket equalization order issued by the Supreme Court of Texas. *See* Tex. Gov't Code Ann. § 73.001.

definition of "firearm" which caused egregious harm to Bell, and that the evidence was insufficient to support the verdict. For the reasons discussed below, we affirm the judgment of the trial court.

Background

The grand jury indicted Bell for aggravated assault with a deadly weapon, alleging in Count I:

> [T]hat DERWIN DEWAYNE BELL, hereinafter called Defendant, on or about the 7th day of June, 2021, in said county and state did then and there intentionally and knowingly threaten ROBERT CURRY with imminent bodily injury by shooting at ROBERT CURRY with a firearm, and did then and there use or exhibit a deadly weapon, namely, a firearm, during the commission of the assault[.]

Count II of the indictment alleged:

> [T]hat the said DERWIN DEWAYNE BELL, in the County of McLennan and State aforesaid on or about the 7th day of June, 2021, did then and there intentionally, knowingly, and recklessly cause bodily injury to ALEXANDRIA GOODMAN by shooting ALEXANDRIA GOODMAN with a firearm, and the Defendant did then and there use or exhibit a deadly weapon, namely a firearm, during commission of the assault[.]

Several witnesses testified at trial. We summarize their testimony below.

*Linda Farley*

Linda Farley was the programmer at the Dewey Recreational Center. The Dewey Recreational Center is a community center that, among other things, has a gym where people play basketball. Farley worked at the front desk where she signed in individuals who wanted to use the recreational center. Through Farley, the State

admitted the sign-in sheet from the Dewey Recreational Center on the night of June 7, 2021. The sign-in sheet showed three individuals relevant to this case that were at the Dewey Recreational Center the night of the shooting: Danacion Presha, Robert Curry, and Derwin Bell.

Farley testified that the police arrived at the Dewey Recreational Center the night of the shooting. She was working at the front desk when two girls came in and asked her if her Mercedes was sitting outside. The girls told Farley that her "car just got shot up." Photos admitted at trial showed her vehicle with several bullet holes.

*Cody Weiser*

Weiser is a K9 officer with the City of Waco Police Department. On the night of June 7, 2021, he heard a shooting call come out over the radio. He proceeded towards Dewey Park and knew his commander was behind the suspect vehicle. His commander was trying to catch up with the suspect vehicle but had lost it. The vehicle was described as a purple Challenger. Weiser was able to locate the purple Challenger. He described how the vehicle caught his attention "because of the way it was driving." The vehicle ran a stop sign. Weiser activated his radar because he could tell the vehicle was going fast and did not appear to have its lights on. Weiser caught the purple Challenger going over 50 miles an hour according to his radar, and Weiser drove "just shy of 100 miles an hour trying to catch up to them." Weiser ran the license plate number and determined that Bell was associated with driving the

3

vehicle and that there was a familial relationship between the registered owner of the vehicle and Bell. Weiser was unable to catch the purple Challenger that night.

On cross-examination, Weiser testified that he "had prior contact with that car running from me" and believed that Bell was the driver. However, he never saw Bell in the driver's seat of the vehicle. Weiser believed that on the night of June 7, Bell was operating the car because the previous time he pursued the vehicle, "other investigators had actually seen who they believed was Derwin Bell. That's why he was listed as a suspect -- -- in the initial pursuit."

*John Hazel*

John Hazel is a crime scene investigator with the Waco Police Department. On the night of the shooting, Hazel was first dispatched to a residence "where some people involved in the shooting had driven to." He photographed a GMC Yukon that sustained damage as well as the people in that vehicle. After taking photographs of the Yukon, Hazel went to the Dewey Recreational Center where the main shooting had happened.

Photographs of the Yukon show that the vehicle had a flat front right tire and damage consistent with a bullet defect on the lower left area of the front bumper. Additionally, the photographs showed bullet defects on the front and rear driver's side doors and windows. The front windshield had a glass fracture that was consistent with a bullet defect. Hazel testified there were eight bullet holes in the

4

vehicle, all on the driver's side. Hazel stated that depending on the direction from which the bullet entered, there was a possible consistency between a front-seat passenger being hit in the left arm and the bullet hole in the windshield of the Yukon.

The photos of the crime scene at the Dewey Recreational Center showed an Altima had defects consistent with being struck by a bullet. There were also several photos admitted at trial that showed shell casings in the parking lot, designated by orange cones. Hazel explained that the groupings of casings in the parking lot indicated that there were shots being fired all over the parking lot consistent with a shooter who is moving. Hazel collected a total of thirty-five casings in the parking lot. The casings Hazel collected were not of the same brand, but he testified that it is not uncommon for brands of ammunition from one handgun to be mixed.

On cross-examination, Hazel testified that he did not know whether the thirty-five casings represented one gun, two guns, or three guns. Hazel could not determine how many weapons or shooters were involved but testified that other investigators may be able to determine other facts in the investigation.

*Kenneth Hall*

Hall works as a recreational aid in the gym at the Dewey Recreational Center. On the night of the shooting, he remembers an argument occurring on the basketball court. He told the participants that "if you don't settle down, you know, we're going to have to shut it down. Eventually, we winded up shutting it down and everybody

went outside." Although Hall did not hear any shots outside the Dewey Recreational Center, someone ran inside the center and "said that they were out there shooting."

*Daniel Kent*

Kent is a detective with the Waco Police Department. He assisted his partner, Detective Conner, with conducting a photographic lineup of the suspect in the shooting. As Conner prepared the lineup, Kent did not know which photo was the suspect. Kent showed the photos sequentially. The lineup was shown to both Robert Curry and Alexandria Goodman at their residence. He showed the lineups separately from one another. Both of them made a positive identification from the lineup. Curry identified photo number five, which is a photograph of Bell. Curry signed and dated the photo and stated that "he's 100 percent sure that is the person that committed the offense." Goodman identified Bell as well, signed and dated the photo, and put "that she's 95 percent sure that that's the person that committed the offense." Goodman and Curry did not have an opportunity to confer with each other before Goodman was shown the lineup.

*Robert Curry*

At the time of the shooting, Curry was dating Goodman, and they were living in her family's house. Curry regularly went to the Dewey Recreational Center to play basketball. On the date of the shooting, Curry went by himself to the Dewey

6

Recreational Center to play basketball and he did not see anyone he knew. After he finished playing basketball, Curry went back home.

Curry later received a phone call from an individual named Danacion whom he knew through playing basketball. Danacion called Curry to get a ride home from the Dewey Recreational Center, which was not unusual. Goodman, who was seven months pregnant with Curry's son, accompanied Curry to pick up Danacion. Curry drove Goodman's GMC Yukon to pick up Danacion.

Curry backed into a parking spot and got out of the vehicle to get Danacion. Curry and Danacion were standing outside the vehicle talking when Goodman told Curry, "Something don't look right" and the shots started. At that point, Curry was standing next to the open driver's side door. Goodman was in the passenger seat with the door closed. Curry "[b]lacked out" for a moment, but remembered getting into the vehicle but couldn't find the keys. While he was getting into the vehicle, Curry remembers "[t]he truck was getting shot at." At that point in time, he did not know if either he or Goodman had been hit. Curry then drove off and made it down the street when Goodman told Curry that "she'd been grazed." Photos admitted at trial show an injury to Goodman's left arm. Curry did not get hit that night.

Curry testified that he was not aware that he was driving on a flat tire. When he parked the Yukon, he noticed a hole in the front of the vehicle. When the vehicle was being shot at, Goodman was able to get on the floorboard. Curry was able to get

7

a look at the individual who shot at him that night. He confirmed that he was 100 percent certain that the person he identified in the photo lineup was the person that committed the crime. Curry made an in-court identification of Bell.

On cross-examination, Curry explained that he was talking to Danacion, who was standing behind the driver's seat with the door open, when he saw something unusual that made him think someone was going to start shooting at him. Curry testified that he saw more than one person but did not remember how many people. He did not know anyone that would have a reason to shoot him. Curry clarified that he saw one person pull a gun and point it at him, but he did not know how many shooters were there because he blacked out. Curry was looking in the direction of where the shots came from and saw more than one person by a car. He had not seen any of those individuals before.

*Bobby King*

King is a police officer with the City of Waco. He assisted Officer Weiser find the suspect vehicle lost in the pursuit. King talked to the owner of the vehicle, Treffany Jones. Jones is Bell's mother. King talked to Jones at her apartment after she had called to report the vehicle stolen. During the course of the shooting investigation, police learned that the same vehicle that Jones was attempting to report stolen was involved in the shooting. Law enforcement did not believe the vehicle was stolen; rather, they believed that Bell drove the vehicle.

*Alexandria Goodman*

Goodman shares two children with Curry. On the night of June 7, 2021, Goodman remembers riding with Curry in her 2004 Yukon "[t]o go pick up Danacion to give him a ride home." Goodman, who was seven months pregnant at the time, sat in the front passenger seat while Curry drove. Curry backed into a parking spot at the Dewey Recreational Center and took the keys out of the ignition. Curry went inside the Dewey Recreational Center to get Danacion. While Curry went inside, Goodman saw two boys sitting on the curb on her side of the vehicle. The boys flashed a gun. Goodman described how the two boys "kept looking" and that "one of them had messed with a gun and put it back and was looking[]" at Goodman, towards her car, making her feel "uncomfortable." Goodman then saw a person getting out of a purple Challenger. That person "was on the phone [and] then went back to the purple Challenger."

Curry and Danacion walked out of the gym to the car. Curry opened the front driver's side door and Danacion opened the rear driver's side door. After that, Goodman saw "sparks." Goodman only realized she had been hit by something when they were getting ready to drive off from the Dewey Recreational Center. Curry and Danacion were outside of the vehicle when the shots were fired. Danacion left the rear driver's side door open and ran off while Curry got into the vehicle. Goodman had to get the keys to the Yukon and put them in the ignition. Goodman then got

down on the floorboard because she heard glass breaking when a bullet came through the front windshield.

Goodman testified that the person who shot was the same person she saw come out of the purple Challenger. As Curry and Goodman drove away from the Dewey Recreational Center, shots continued to be fired.

Goodman confirmed the identification she made of the suspect in the shooting from the photo lineup. She explained that the "95 percent" confidence level she expressed at the time meant that she was "100 percent" sure and that she did not have any doubts. Goodman also made an in-court identification of Bell.

On cross-examination, Goodman explained that the man in the purple Challenger went over to the boys sitting on the curb, spoke with them, walked back to the purple Challenger while talking on the phone, and grabbed a gun out of the purple Challenger. She also saw that the two people sitting on the curb had a gun but did not know "if they end[ed] up giving the boy in the Challenger the gun or what, but he went to the car to get a gun." When Curry and Danacion came out of the Dewey Recreational Center, the man by the purple Challenger had a gun "[b]ecause he started shooting right after that, . . . [.] He didn't go back to the boys sitting on the curb again after that." Goodman recalled telling Curry and Danacion, "I don't know what's going on. But these two boys sitting right here, and they keep on

10

looking, and they flashed a gun." Goodman described one of the subjects sitting on the curb as being 5'8" and 180 pounds.

Neither party objected to the jury charge. The abstract portion of the charge provided the following definitions for "deadly weapon" and "firearm" applicable to Count I:

> "Deadly weapon" means a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.

> "Firearm" means any device designed, made, or adapted to expel a projectile through a barrel by using the energy generated by an explosion or burning substance or any device readily convertible to that use.

> The application portion of the jury charge stated:

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 7th day of June, 2021, in McLennan County, Texas, the Defendant, Derwin DeWayne Bell, did then and there intentionally or knowingly threaten Robert Curry with imminent bodily injury by shooting at Robert Curry with a firearm, and did then and there use or exhibit a deadly weapon, namely a firearm, during the commission of the assault, then you will find the Defendant "Guilty" of Aggravated Assault as charged in Count I of the indictment.

> Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the Defendant of Aggravated Assault as charged in Count I of the indictment, and say by your verdict "Not Guilty."

11

The jury returned a verdict of guilty in Count I of the indictment, aggravated assault with a deadly weapon against Curry. The jury sentenced Bell to thirty years in prison.

## Sufficiency of the Evidence

In his second issue, Bell complains that the evidence is legally insufficient to convict Bell of aggravated assault. We address his second issue first as it would afford Bell greater relief than his first issue. *See Benavidez v. State*, 323 S.W.3d 179, 182 (Tex. Crim. App. 2010) ("[A] finding of legal insufficiency on appeal would interpose a jeopardy bar to retrial."); *see also Ex parte Reyes*, 474 S.W.3d 677, 681 (Tex. Crim. App. 2015).

The jury is the exclusive judge of the credibility of the evidence and the weight to be given to that evidence. *Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). As such, the jury is responsible for resolving conflicts in the testimony, is free to believe some, all or none of a witness's testimony, and may assign as much or as little weight to a witness's testimony as it sees fit. *Id*. Jurors may also draw reasonable inferences from the evidence. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). "[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them." *Id*. at 16.

When examining whether a criminal conviction is supported by legally sufficient evidence, we compare the evidence to the elements of the offense as

defined by a hypothetically correct charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). We consider all the evidence, viewed in the light most favorable to the verdict, along with the inferences that could reasonably be drawn from the evidence. *Hooper*, 214 S.W.3d at 13. We do not assess the credibility of the evidence, reweigh the evidence, nor substitute our judgment for that of the jury. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

The evidence is legally sufficient to support the conviction if any rational trier of fact could have found each of the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). "Each fact need not point directly and independently to a defendant's guilt, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016) (citation omitted); *see also Garcia v. State*, 667 S.W.3d 756, 761-62 (Tex. Crim. App. 2023) (citation omitted) ("A proper review of evidentiary sufficiency considers the cumulative force of the evidence.").

A person commits aggravated assault if the person commits assault as defined in Texas Penal Code section 22.01 and the person: (1) causes serious bodily injury to another, including the person's spouse; or (2) uses or exhibits a deadly weapon during the commission of the assault. Tex. Penal Code Ann. § 22.02(a). A person commits the offense of assault if the person (1) intentionally, knowingly, or

13

recklessly causes bodily injury to another, including the person's spouse; (2) intentionally or knowingly threatens another with imminent bodily injury, including a person's spouse; or (3) intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative. *Id.* § 22.01(a).

On this record, the jury could have reasonably inferred that Bell intentionally or knowingly threatened Curry with imminent bodily injury by shooting at Curry with a firearm. The eyewitness accounts and the forensic evidence showed that the shooting was in the direction of the gold Yukon which Curry was driving. Both Curry and Goodman testified that they identified Bell in a photo lineup as the person that committed the offense. Curry identified Bell with a 100 percent confidence level and Goodman identified Bell with a 95 percent confidence level, but in court she identified Bell with a 100 percent confidence level.

The evidence also supported a reasonable inference that Bell was at the Dewey Recreational Center and was driving the purple Dodge Challenger that night. The sign-in sheet from the night of the shooting shows that Bell signed in to the Dewey Recreational Center. Law enforcement testified that the purple Dodge Challenger fled the scene of the crime, speeding and driving without lights. Based on previous encounters with the vehicle, law enforcement believed Bell drove the purple Challenger, and Goodman identified Bell as the man that was in the purple

14

Challenger at the Dewey Recreational Center. Although the defense argued there was a possibility of two shooters and that Bell was not the person who shot at Curry, we must defer to the responsibility the jury has to resolve the conflicts in the testimony, to weigh the evidence the trial court admits into evidence in the trial, and to draw inferences from the basic facts to the ultimate facts the jury must decide to resolve the issue in dispute in the trial. *Hooper*, 214 S.W.3d at 13. By its verdict, the jury rejected the defense's theory that Bell was not the shooter.

As the sole judge of the weight and credibility of the evidence, the jury bore the burden of determining what to believe. *See Metcalf,* 597 S.W.3d at 855. Based on the record before us, viewing all the evidence in the light most favorable to the jury's verdict, we conclude that a rational jury could have found, beyond a reasonable doubt, that Bell committed the offense of aggravated assault with a deadly weapon against Curry. *See* Tex. Penal Code Ann. § 22.02(a); *see also Jackson*, 443 U.S. at 318-19; *Hooper*, 214 S.W.3d at 13. Bell's second issue is overruled.

Jury Charge

In his first issue, Bell complains, "The trial court reached into Chapter 46 for a definition of 'firearm.' The definition did not apply, but assuming it did, the trial court did not include the portion of the definition that would have allowed Appellant

15

to argue the State had not carried its burden. The error was not objected to but caused egregious harm."

When reviewing alleged charge error, we determine whether error existed in the charge and, if so, whether sufficient harm resulted from the error to compel reversal. *Ngo v. State*, 175 S.W.3d 738, 744 (Tex. Crim. App. 2005). "Only if we find error do we then consider whether an objection to the charge was made and analyze for harm." *Tottenham v. State*, 285 S.W.3d 19, 30 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (citations omitted). If charge error exists but the defendant did not object to the alleged error at trial, we may reverse the judgment only if the resulting harm is so egregious that the defendant did not receive a fair and impartial trial. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see also Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002). "Jury charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Allen v. State*, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008) (citation omitted). In assessing the degree of harm, we must consider the entire jury charge, the state of the evidence, the argument of counsel, and any other relevant information revealed by the record. *See id.*; *Almanza*, 686 S.W.2d at 171. An appellant must have suffered actual harm, not merely theoretical harm. *See Sanchez v. State*, 376 S.W.3d 767, 775 (Tex. Crim. App. 2012) (citing *Arline v. State*, 721 S.W.2d 348, 352 (Tex. Crim. App. 1986)).

As indicated above, according to Texas Penal Code section 22.01, a person commits the offense of aggravated assault if the person commits an assault and uses or exhibits a deadly weapon during the commission of the assault. Tex. Penal Code Ann. § 22.01. Section 1.07(a)(17) defines "deadly weapon" for purposes of the entire Penal Code, necessarily including whether an assault qualifies as an aggravated assault under section 22.01. *Id*. § 1.07(a)(17). The definition of "deadly weapon" includes "a firearm." *Id*. Therefore, if a person uses or exhibits a firearm during the commission of an assault, the person has committed the offense of aggravated assault.

Section 46.01(3) defines "firearm," but only for purposes of Chapter 46 which contains various prohibitions regarding the possession or carrying of certain weapons in certain locations and under certain circumstances. *Id*. § 46.01(3). This section indicates certain antique firearms, curio firearms, and replicas of such firearms are not included in the definition of "firearm," thereby making such items exempt from Chapter 46's prohibitions. Nothing in section 46.01(3) or any other provision of the Penal Code makes it lawful for a person to assault another person with an antique, curio or replica firearm, nor is there any Penal Code provision indicating that an aggravated assault is not committed so long as the weapon being used or exhibited during the commission of an assault is an antique, curio or replica

firearm. No evidence was presented at trial that any firearm involved in this case was an antique, curio or replica.

Therefore, it would have been error for the court's charge to have defined "firearm" as that term is defined in section 46.01(3), because the inclusion of such a definition would have given Bell a defense to which he was not entitled, to wit: that the firearm used during the assault was an antique, curio or replica. But no such error occurred, because the court's charge did not define "firearm" as it is defined in section 46.01(3). Instead, Bell complains that the court erred in failing to include section 46.01(3)'s definition of "firearm" in its entirety, even though section 46.01(3) does not apply in this case. Bell cannot be heard to complain that the trial court did not commit an error that would have worked in his favor. We conclude the trial court did not err by omitting from the charge a definition that did not apply in this case, either as an element of, or as a defense to, the charge of aggravated assault. We overrule Bell's first issue to the extent he argues the trial court erred by not including section 46.01(3)'s definition of "firearm" in its entirety.

In addition to complaining about what the charge did not include, Bell complains about what the charge did include. The charge defined "firearm" as: "any device designed, made, or adapted to expel a projectile through a barrel by using the energy generated by an explosion or burning substance or any device readily convertible to that use." Bell argues it was error to include this definition because it

18

comes from section 46.01(3) which does not apply in this case, and because it is generally impermissible for a trial court to define terms which are not statutorily defined.

We agree the trial court should not have included a definition of "firearm" in the charge, not because the definition was derived from an inapplicable statute, but because it was not derived from an applicable statute. *See Walters v. State*, 247 S.W.3d 204, 214 (Tex. Crim. App. 2007) ("Normally, if the instruction is not derived from the code, it is not 'applicable law.'"); *see also Garrison v. State*, 726 S.W.2d 134, 138 (Tex. Crim. App. 1987) (en banc). In *Garrison*, the charge included a definition of "knife" derived from section 46.01(7). While the Court of Criminal Appeals held that "the trial court should not have included such definition in an aggravated robbery charge[,]" the Court clarified that "[i]t is difficult to characterize the definition as 'error' because it is not that the definition does not fit the weapon used by appellant, but simply that the specific definition is set out for use with Chapter 46 offenses." *Garrison*, 726 S.W.2d at 138-39. Assuming without deciding the mistake constituted error, the Court ultimately concluded Garrison was not deprived of a fair trial. *Id*. at 139.

Similarly, in this case, even if the definition of "firearm" in the charge constituted error, we cannot reverse Bell's conviction without first analyzing whether or not the "error" constituted egregious harm by depriving Bell of a fair

trial. *Almanza*, 686 S.W.2d at 171. "Egregious harm is a 'high and difficult standard' to meet, and such a determination must be 'borne out by the trial record.'" *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015) (quoting *Reeves v. State*, 420 S.W.2d 812, 816 (Tex. Crim. App. 2013)); *see Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013) ("[Egregious harm] is a difficult standard to meet and requires a showing that the defendants were deprived of a fair and impartial trial."). An error results in egregious harm only "if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *See Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996). The harm must be actual, not merely theoretical. *Arline v. State*, 721 S.W.2d 348, 352 (Tex. Crim. App. 1986). When analyzing whether charge error results in egregious harm, we must examine "the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171.

The charge as a whole required the jury to find Bell used or exhibited a deadly weapon, to wit: a firearm, during the commission of an assault. The charge's definition of firearm has not been shown to deviate in any way from the commonly understood meaning of the word. We conclude the charge as a whole weighs against a finding of egregious harm.

The evidence at trial showed that a firearm was used. Hazel explained what "casings" are, the components of a bullet, and the procedures he used for marking where he found casings. Bell does not dispute that the evidence at trial showed that the weapon in question could rapidly discharge a large quantity of bullets. The photographs admitted at trial show bullet defects in the gold Yukon as well as the Altima and Mercedes that were at the crime scene. Goodman testified that she saw a gun on the night of the shooting, and both Curry and Goodman testified regarding the shooting. We conclude the evidence admitted at trial weighs against a finding of egregious harm.

In its closing argument, the State briefly addressed the use of the firearm in terms of a deadly weapon: "A deadly weapon can be a lot of different things. Obviously, in this case it's a firearm. We've got 35 shell casings from that parking lot to show that a firearm was used. And under the law, a firearm is automatically a deadly weapon."

Most of defense counsel's argument to the jury discussed the possibility of two shooters and the lack of a positive identification that Bell was driving the purple Challenger. Defense counsel argued that none of the witnesses testified that Bell was driving the purple Challenger on the day of the shooting. Moreover, Curry did not testify that he saw Bell point the gun at him and shoot him. Defense counsel contended that there were probably two shooters because of the number of shell

21

casings found on the scene, the testimony that shows there were two individuals on the curb, and Goodman's testimony gives rise to the possibility of three shooters. Defense counsel's arguments implied that one of the two individuals on the curb could have been the shooter. We conclude the arguments of counsel weigh against a finding of egregious harm.

After reviewing the record, including the entire charge, the state of the evidence, the arguments of counsel and other relevant information, we conclude the alleged error in the charge did not result in egregious harm because it did not affect the basis of the case, it did not deprive Bell of a valuable right or vitally affect a defensive theory, and Appellant was not deprived of a fair and impartial trial. *Almanza*, 686 S.W.2d at 171. We overrule Bell's first issue.

Conclusion

Having overruled Bell's issues, we affirm the judgment of the trial court.

AFFIRMED.

KENT CHAMBERS
Justice

Submitted on June 27, 2025
Opinion Delivered April 8, 2026
Do Not Publish

Before Johnson, Wright and Chambers, JJ.

22